Good morning, Justices. My name is James Dahl, D-A-H-L. I represent David Koenen, both individually and in his capacity as guardian of the estate of his father. Alright, thank you. Counsel for Mr. Leonard Koenen, could you give us your name one more time? Certainly. I'm kind of new to the game here. I know, that's my problem. I usually circle it on the brief. You couldn't find it. Okay. First name is Peter, the last name is Schmidt. S-C-H-M-I-E-D-S-N-D-A-V-I-D-E-L. Alright, thank you, Counsel. And we're all from official.com, also here with my colleague Amanda Byrne. Thank you. Let me ask you, as you've told us who you are. Sure. What's going on in the court below? We've got the oral changing the attorneys, and if you could just give us a little background, because that plays into one of the issues we have with the brief filed by your predecessor. So tell us. There was a motion filed by the guardian ad litem who was appointed in this case, David Martin, who was appointed after the adjudication of Mr. Kannon in December of 2013, or July of 2013, I apologize. He filed an emergency motion asking for a substitution of counsel on behalf of Mr. Kannon, both in this court and an appending chancellor action case ongoing. He brought that to the attention of the court who is now overseeing the guardianship case. Judge Stewart has since retired. It's Judge McCarthy who is now in charge of the guardianship case. It was based on a request from Mr. Kannon to the guardian ad litem that he wanted to have other counsel to proceed rather than the counsel that he had for his trial counsel. And as a consequence of the motion that was brought by Mr. Martin, I did not participate in that motion. I did interview Mr. Kannon, and prior to, I think he talked to some other attorneys as well, I interviewed him prior. He asked that I step up and represent him. I said I would do that. I understood there was an oral argument on August 19th, and this was about a little over two weeks ago when this happened, I believe. I believe that I understood the issues, and I have experience in probate matters, and I thought I could step up and do a good job for Mr. Kannon. I hope that's true. Tell me how you spell your name again. Sure. S-C-H-M as in Mary, I-E-D as in David, E-L. First name Peter. So Mr. Schmidl, you are representing Mr. Kannon both in this case now, having inherited the Shoehex brief. Correct. And in the ongoing chancery case. Correct. Okay. Are you involved in the ongoing guardianship case? Not yet. Okay. No, I'm not. So my roles are distinct at this point in time. Mr. Kannon has a guardian, hopefully that he will have a guardian after this argument. He has a guardian, so he doesn't have an attorney that's appointed to represent him in the ongoing guardianship case. He does have a guardian in Leiden, but that's not the same thing as an attorney that represents his interest. Mr. Martin is there to represent what he thinks is his best interest, but he's not his attorney. All right. Thanks for the background. Let's proceed with the issue. Any other questions, obviously stop me and I'll let you know. I'm here to ask this court based upon what happened below, and I think what happened below was unfair to Mr. Kannon right from the very beginning of this case. When I say the beginning of this case, and I'm turning this court's attention to July of 2011, when certain actions took place between his sons and Mr. Kannon that transferred probably about 80 percent of his assets from Mr. Kannon to his sons. What happened on July 2nd is important because it informs the entire process going forward, and I think it undercuts the petitioner's allegations in this case that Mr. Kannon was completely unable to make financial decisions. That's the finding that's at issue here. Was Mr. Kannon throughout this entire process unable to manage, totally unable to manage his estate? And I'm going to hopefully persuade the court that not only was he able to manage his estate during that period of time, but he was also managing the finances of the very petitioners that brought the petition alleging that he was unable to manage his estate. What happened on July 2nd of 2011? His sons showed up to his house unannounced, one of them is an attorney, they have documents that they want Mr. Kannon to sign, documents he did not solicit from them, documents that he did not ask him to prepare, documents that transferred his assets basically to him. Now the petitioner's claim, this was some kind of process that took place earlier in the spring where he met with his accountants, this was kind of an estate planning, an estate planning, this was consistent with his estate planning wishes. That's totally untrue, Judge, in my humble opinion. What happened in between the spring of 2011 and July of 2011 is that Mr. Kannon met a new woman, he met a new woman friend, and he brought her an expensive gift in pretty close proximity to their knowing each other. It terrified the sons. It terrified them into believing that he may, he is the father, he was now 82 years of age. It terrified them that his father was going to start taking actions that were going to diminish their interest, what they thought was their entitlement to his assets. We're talking a lot about motivation, we understand about the meaning, and that's to be resolved in the Cheney Street case. But isn't our role here today to determine whether or not the guardianship decision by Judge Stewart was against the manifest way of the evidence that she heard? Absolutely, you're absolutely correct. But what happened there is important to determine whether or not in fact the evidence is against the manifest way of the evidence. Because what happened was that he transferred important assets involuntarily according to him, or involuntarily according to him. He transferred his house that was in trust for himself that he was living in Barrington. He transferred it out of, he made his sons the trustees, so they were now in charge of his house. But he kept the life estate, didn't he? That's a Wisconsin property, that's the next piece of property. They, the next day after they became his trustees, they transferred the Wisconsin property worth about a million dollars out of his trust to the sons individually. And yes, he kept a life estate. But who was responsible from July 2nd of 2011 until July 22nd of 2013 to maintain those properties? Who was the person who stood in between the taxes being paid or the tax collector coming and taking the property in Wisconsin, the pipes freezing in the wintertime, utilities going out? Who was the person who was responsible during this entire period of time to make sure that the insurance was paid, both on the house in Wisconsin and on the house in Barrington? Who was Mr. Kainan throughout the entire period of time? He didn't even own the house, yet the people who were owners of the house relied on him to manage those important finances during this very period of time. That's why July 1st is important. Wasn't there some testimony that all those transfers were done because of Mr. Kainan's desire to minimize his eventual estate taxes? Well, that was the testimony from the sons. But he transferred, Judge, about 80% of his assets. On the low end of that particular valuation of these properties, that was about, on July 2nd, it was about $5 million. My question is, wasn't that testimony that was presented that Judge Stewart heard and obviously it had some credibility, was that ever refuted? Yes, Mr. Kainan refuted it. He didn't say this was part of my estate planning. He said these people came and forced me to sign this document against my will. Okay, and now we've defined a dispute. And under our standard of review, isn't that Judge Stewart's call? It's her call. I understand under the manifest way of the evidence you're supposed to weigh the credibility of the witnesses and you defer to the trial judge with respect to those weighing the credibility and resolving the credibility issues. But I go back to it. This is going to be my mantra. How can you allow someone who is totally incompetent, as the petitioners say he was, to totally incompetent and unable to manage any part of his assets, be in charge of your assets for a two-year period of time, and the evidence was he did just fine. Everything was correct. All the taxes were paid. All the utilities were paid. The undisputed evidence is he was doing exactly what they said that he couldn't do. The actual evidence was... What did Judge Stewart base her finding on? I don't know, Judge. That's a good question. She just based her finding on what? I mean, if you're saying that the undisputed evidence was that he was competent to do all of these things, the judge just made a ruling on what? I wish I could be more specific. I don't know what she based her ruling on, other than the form order that she filled out, or was filled out, on July 22nd of 2013. It's just a form order. She says she based it on the evidence and she based it on Dr. Amdur's CCP survey. Maybe my question is more rhetorical, because it certainly seems like there was sufficient testimony about many of the actions that the Sons were complaining about that the judge could come to a conclusion, yeah, somebody who is in possession of their faculties probably wouldn't do this. There was a lot of testimony of, you know, actions by your client that would belie what you're saying now. Well, I don't know what actions specifically the court is referring to. Well, you can start with the birthday gift. Yeah, I mean, how about that? He gave an inappropriate birthday gift. Yes, he gave an inappropriate birthday gift. I would say it's more than inappropriate. But here's something that's important to understand here in the context of this. They said, the Sons said he was totally competent on July 2nd to do everything he did on that date. And then from that date until November of 2011, he fell off the cognitive cliff, as it were. He became a feral, calf-hunting old man who gave inappropriate gifts without any intervening action that would explain anything that could possibly explain this kind of precipitous decline. I would testify, though, that there was kind of a diminishment. I think the first time he tested him, he was at 26. And then by the second time he tested him, he was at 22. So, I mean, that would suggest that his Sons could reasonably believe that he's doing okay. And as time went by, he's not as clear as they would like him to be. I mean, it seems to me that there is certainly a lot in the record that you're not addressing. And I would really like you to address that because I think the birthday gift and the testimony about hearing voices on the telephone instructing and cloning his phone and that the cell phone was bugged. I mean, all of these are things that I think need to be addressed in the context of whether or not this is a person that's really thinking rationally. Well, fine, I can address those issues. I think you also need to understand the context of what was happening between him and his Sons during that period of time. He wasn't trusting his Sons during that period of time. Was he suspicious of their motivations? Yes, there's testimony that he thought he wanted a new phone because he got it from his son and he thought that there were voices that he heard on the phone and that the judge could have taken that into consideration. But I also want to point out to the Court that in January of 2013, when a battle with neuropsychological testing that tests whether or not it was delusional or paranoid thinking was present, he came out no. So there was evidence in the record from objective standardized tests that disputed the fact that this man was having any kind of delusions relative to what was happening in his life. Didn't the doctor who opined that he needed a guardian also use objective standardized tests to reach that conclusion? Well, if you're talking about Dr. Ander, the first test he gave him was in January of 2008, excuse me, 2012, where he tested normal. He tested normal. The other is an evolution here. Well, I think you need to take into consideration the fact that Dr. Ander was the consultant for the plaintiffs or the petitioners here. He was the consultant for the lawyers. This was not an independent person. And how Dr. Ander became the doctor is... Now, there was also an independent doctor appointed by the Court, was there? Well, Dr. Ander supposedly was the independent doctor that was appointed on December 21st of 2011, but he wasn't independent. He was the consultant for the petitioners. He had been contacted by the petitioners. I just have to underscore what happened on December 21st. In this case, Judge, there was a petition that was filed in November of 2011 saying Mr. Kainan was completely unable to make personal or financial decisions. He's not served with any summons. No summons are served. The lawyers for the petitioners come into court on December 21st with no notice to Mr. Kainan that there is a proceeding that's in place that is about to try to take away his ability to make personal and financial decisions. Do they give him notice of that? He's not served with process, because a new counsel comes in and says, I want three things. I want primary appearance. I want a special process server. And I want a doctor appointed. Because this is going to be a fight. Mr. Kainan is going to object to these proceedings. This is going to be a fight. Do you have a transcript of that hearing? We do have a transcript of that hearing. Now, doesn't the statute specifically say something to the effect that, you know, when a case like this is filed, the court appoints someone, and it doesn't hinge on whether summons has been issued yet? No, Judge, I totally disagree with that. I totally disagree with that. In fact, what that statute says is that if it doesn't accompany, you can appoint somebody. And that appointment has to be 10 days before the hearing date. But the summons, in order to get jurisdiction over the party, has to be at least 14 days before the hearing date. So you've got this notion of fundamental fairness. He would have had the opportunity, had he had notice with respect to this, to come in and say, I don't want to talk to this doctor. I can go to my own doctors. Those are the cases of Seligman, Williams v. Kohling, and Luke Hayes v. Haynes. If he could have established with his own doctors that he didn't need, which all two of his doctors and the neuropsychologists all agreed he didn't need a guardian. But didn't the court eventually get that testimony? The court eventually got that testimony. Yes, he did. You know, so the court had access to the very testimony you're arguing should have been presented to the court. My argument is a little more subtle than that, Judge. I think what happened is what was wrong in terms of appointing Dr. Andrew without any notice to Mr. Caney. Without at least a notice, not necessarily summons, but a notice. We are trying to get a doctor appointed to come out and evaluate you, to determine whether or not your right to make decisions for yourself should be stripped away from you. He had the right to basic fundamental fairness, basic fairness to have that notice that wasn't given to him. Where in the probate act or in the civil practice act is it anywhere that you can get an ex parte hearing on a very important part of this proceeding without giving notice to the very person who is most at risk with respect to going forward? And the other part, the other thing here with respect to Dr. Ender. Assuming that we buy your argument that he should have had notice, what's the prejudice? Tell me how he's prejudiced. Exactly the prejudice. Here's the prejudice, Judge. Not only did the doctor get appointed without his notice to him on December 21st of 2011, but there was no guard that would let him appointed. The statute, the probate act also contemplates the appointment of a guardian ad litem. They knew this was going to be an objective. The judge knew this was going to be a contest. What is the role of a guardian ad litem under these circumstances? The role of a guardian ad litem is to go out and visit even before summons is served. But wasn't there a G.A.L. appointed long before the trial? Absolutely not. There was never a guardian ad litem appointed until after the adjudication. Then because he had private counsel? No, not because he had private counsel. It has nothing to do with whether or not he has private counsel. People get guardian ad litems all the time with respect to the fact that they have private counsel. It's irrelevant. What was important here was that there was no notice, no procedure in place. This is typical in almost every probate case that a guardian ad litem is appointed. And the role is to go out, here's the petition, here is your notice of rights, which is important. The notice of rights say you have a right to an attorney, you have a right to object, you have a right to have your own doctor. So they didn't have a G.A.L. that was appointed. That was another thing that prejudiced Mr. Caney greatly. They didn't serve him with the summons. The summons in the Probate Act also listed what his notice of rights are. So if they would have served him with the summons, he would have known, I can get a doctor, I can get a lawyer, I don't have to speak to Dr. Ender. And what did Dr. Ender do when he went out there on January 7th? He went out there with a court order, the order that was the result of an ex parte proceeding, and tried to use it to make Mr. Caney talk to him. And Mr. Caney was reluctant to talk to him. He didn't want to. He was persuaded to talk to Dr. Ender through the telephone call of the third son. Two of the other sons were present. If they could find the presence of mind to get Dr. Ender out to the house to have a psychiatric examination, why couldn't they have the presence of mind to get a summons served on him prior to Dr. Ender getting out there? Because if that would have happened, Your Honor, he would have then had the opportunity to go to the two doctors that he did go to, Dr. Cash and Dr. Argumento, who was totally independent, both of whom concluded that he had full capacity to make personal and financial decisions. He could have presented that to the judge prior to Dr. Ender's report, or prior to the appointment of somebody like Dr. Ender, and had the case dismissed. Had the case dismissed based on certain reasons? That's where I think your argument falls apart. You're saying, I could have had the case dismissed, but then the other side, the sons come in and say, no, this is why the doctors are not correct. You're assuming that it's ex parte on his side then, aren't you? No, it's not ex parte on his side. They knew that he had every right to go get his own doctors. He had every right to. He didn't ask the court to give him permission to go get his doctors. He went to his own doctors. What you're telling me is Judge Stewart, in the imaginary scenario you're drawing out, that Judge Stewart would have been presented with this evidence from Mr. Kainan's own doctors saying he's perfectly fine. And the judge would have said, oh, fine, end of story. All you sons who believe he's not go home, I'm not going to hear anything from you. It wouldn't work like that, would it? Well, it could work. It did work like that in Silverman. It did work like that in Williams v. Coleman. It did work like that in Haynes. You're right. The difference here is that there was a report from Dr. Ander that predated the reports of these two doctors. My argument is that report should have been disregarded. Now, how was that raised in the notarial court? Why would it be disregarded? Is it incompetent? Is the person not a licensed physician? No, because of … Because the manner in which the appointment came down was without, he was without jurisdiction over the party at the time that the appointment was made, without notice to him, and without him having an opportunity to get his own evidence to defend himself or put forward to the court in the first instance. So that's my argument. So I understand your skepticism with respect to it. But he ultimately, Mr. Schmigel, he ultimately got to present his medical evidence to the court. So the court got to consider that. That's what's bothering me. It's not as though the court didn't give him an opportunity to present the evidence from these two doctors that you are now saying would have been definitive. The court got to consider that. The court did get to consider that. And the evidence that those doctors put forward, I would suggest to you, was completely consistent with what the undisputed facts were. The undisputed facts were that he was taking care of his finances. That's what they based their decision on. There were also other facts that show that he was doing other things that would not be consistent with or would be consistent with dementia. I mean, the gift, you kind of make light of the inappropriate gift, but I think that that was something certainly that the judge could consider. The feral cats living in the garage after having been scratched by a cat, previously you would think that he would want to avoid. There are a lot of things. The voices on the telephone. The fact that he thought his phone was being cloned. All of those things are factors, and you are asking us to just totally disregard what the trial court looked at and hang our entire decision on the fact that he didn't have a chance to know before the doctor was appointed that this was coming down and maybe the judge would have done something different. I'm having trouble following that argument. With all due respect, Your Honor, that's not what I'm asking the court to hang its hat on. What I'm asking the court to hang its hat on is notwithstanding everything that you just said, all of the issues that you just identified, the bad gift, the cats. Mr. Kagan testified about it. Let me digress for one second and talk about the cats. He lived in South Barrington. He loved the outdoors. He loved the animals. He talked about the raccoons. The notion that these cats were something that were new to this house, that somehow came up between July of 2011 and November of 2011 when the petition, it's just not borne out by the record. It's just not borne out by the record. But what I'm saying to you, Judge, is look at what actually was happening. The actual finding in this case, the actual finding, and I'll read it, that he is, that the respondent, that's Mr. Kagan, is totally unable to manage his or her estate or affairs. That's the finding. What was he doing during that period of time? That's what I'm trying to focus this court on. What is the evidence of whether or not he was actually doing these things at the very time that the estate or the petitioners were saying he couldn't manage them? He was doing exactly that. And who, if they really thought that their father was totally unable to manage his finances, who would let them leave him in charge of two multimillion dollar pieces of property? Well, obviously they thought that he couldn't manage it. That's why they brought the petition. I mean, that's what it seems to me. But why would they let him do that during the time the petition was pending? They testified. The finding hadn't been made, Mr. Schmidl, until that time. How could you? They couldn't take away from him. I'm not following your argument. Maybe that's what I should say. It was their property. It was their property he was taking care of. That's the point. I wasn't able to talk about the power of attorney. I'm sorry. The power of attorney issue is another. But it was their property he was taking care of, not his property, Judge. They allowed him to stay on his property. Let me ask you before you wrap up, and I'm going to ask opposing counsel the same question. We, the Chief Judge established the Elder Law Miscellaneous Remedies Division. The chain of three case is still going on. The guardianship is going to be presumably still going on, at least in some respect, no matter how we rule, even if it's wrapping things up, which is probably what you would want. Why shouldn't we recommend that both cases get reassigned so they're in front of the same judge in Elder Law? I don't see any particular reason why you couldn't do that. I don't really know how functional the Elder Law Division is actually. You're sort of waiting for things to come to it. As much as I do in probate, Judge, I've never been there, and I've been doing this for a long time. It's a new division. Well, it's about four or five years old. I think it was established precisely for things like this where you've got somebody who's involved in the guardianship and they're fighting over whether they did or did not authorize things properly and get a chance for a case. And you've got a domestic violence case underlying this too. That's the other part of this. So that they all could be in front of one judge who could manage it. Judge? Okay, you've answered my question. Thank you. Are there any other questions from the panel? If the court please. Again, my name is Jim Dahl. I represent the son, David Kanin. I want to answer your question first, which is I do think it belongs there. I think both cases, the Chancery case and the guardianship proceeding, belong in front of one judge. I think it's a good idea. And I agree today that we would stipulate to do that. Number two. Before you go to number two, I think you could walk over there right now and go to Judge McCarthy and ask for the transfer. And we will do that at 2 o'clock. Obviously, the case is going to be under advisement for some time. You've got the Chancery case ongoing. Judge Kanin and Chancery would be delighted. Judge McCarthy will probably be delighted. We'll be there in front of Judge McCarthy at 2 o'clock this afternoon. I certainly will ask her to do that. I want to answer now the court's first question is what is happening in the guardianship case? What is happening in the Chancery case? In a guardianship case, I think the most significant thing is what's not going on. There is no notion, no suggestion, nothing that suggests that David Kanin is doing anything wrong with respect to managing his father's estate. With the understanding that the court properly entered an order a time ago that said David does not have anything to do with the Chancery case. It makes sense. What's happening in the Chancery case is that on our motion, we had a Chancery case pending for over a year in which the plaintiff was a disabled person. We followed the motion and said you've got to straighten this out. Somebody has got to come in and finally they agreed to have Mrs. Kanin appointed his next friend. Now that's what's going on in those cases. I want to address, I think, something that counsel has, I think, the difficulty of coming into a Chancery case trying to master that. Coming in with these briefs and what we got today was, I think, part of a closing argument in the Chancery case. It didn't deal with what Judge Stewart dealt with. He still hasn't responded to, respectfully, anything about the gift. Not anything about feral cats, but it goes way beyond that. It goes to $450,000 has gone missing in the 15 months he knows now Mrs. Kanin. And he can't account for half of it. It's just gone. He's saying to friends, I only have $50. He's got over $2 million in his possession and under his control. I have no idea what counsel was talking about in terms of letting Mr. Kanin manage the properties for two years. After July 2nd, when my clients became trustees, they took over control of the properties. They managed them. And then there's another error there. They didn't do anything with respect to the house in Barrington. The house in Barrington was in mom's trust. Dad was trustee. Dad transferred that trusteeship. But in terms of the management and the operations of those properties, it fell to the sons. They don't want to talk about the fact that he thought his phone was bugged. Just that, coupled with that gift. What do you say about that? You say, well, they passed some objective tests so he must be okay. But they don't want to talk about the doctors. Dr. Amdur, regardless of when he was appointed, regardless of his testimony would have been his testimony. And the fact is this man has done this 1,200, 1,300 times and he says this man is disabled. They don't want to talk about the two doctors that they had examined because Dr. Cash had been this man's physician for four months. She had treated him but never asked for a power of attorney or anything like that. Then they go to the other doctor, Dr. Agumendo. This was this doctor's first occasion in opining on somebody's competence or whether he was a disabled person or not. And then they came back and they saw, I think, the deficiencies in that testimony and evidence. They came back with the tester. They haven't raised an argument before you but they have in their briefs the fact that Dr. Amdur talked to the Canaan brothers. And some of them suggest that that in and of itself is wrong. But they don't come before you and say, this is the information that the Canaan sons gave to Dr. Amdur that was wrong, that shouldn't have been given to him. And that's the problem with this whole thing is they can never point to in any of what they claim to be the procedural problems. By the way, they never complained about the absence of a GAO. Competent counsel, experienced counsel represented Mr. Canaan at court below and they never said, we'd like a guardian ad litem. That didn't happen. And now they come before you without putting it in their briefs and say, well, they should have had a guardian ad litem. They could have had a guardian ad litem. They should have asked for one. I think the other issue is with respect to the complaints they make with respect to Dr. Amdur. We never saw those in court below until after, after, after Judge Stewart's decision. They then say, whoops, this was procedurally incorrect. No objection to his appointment. No motion to strike his testimony. No objection as it's going on. It just comes up after the fact. When you say after the fact, was it brought up below after the fact? It was brought up below for the first time. After the doctor had been appointed and conducted two tests. Yes, Your Honor, that's correct. I think it was on what they called the amended and I think it was the third motion to reconsider. With respect to the powers of attorney, I'm sorry, with respect to the competence issue, the disability issue too, they don't ever touch on it. They didn't in their reply. That while this man is testifying in court, he's asked, well, what account is that? Well, I won't tell you. What do you mean you won't tell us? Well, there have been mysterious withdrawals from that account and I don't want anybody to know about it. I wasn't there. I was in the trial order. But that must have been a very interesting colloquy. I think the other thing they don't talk about is that this man had no idea what a power of attorney for an estate was. They said, well, did you think this just dealt with your real estate? Yeah. Well, do you understand that this allows Nancy, your wife, that you've given this defective power of attorney to, to give herself gifts? No, no, not any amount. She can only give herself small gifts. I'd be okay with that. The man did not understand that the power of attorney for property that he gave to Nancy gave her unfettered control over all of his property, not just real estate, and gave her the ability to give herself whatever gifts she wanted. Judge Stewart, an experienced trial judge, heard all of this evidence and she told us in her findings of fact, which they criticized. I make the appropriate finding that he's unable to make these decisions. I accept Dr. Amdur's report. What more did she need to do? And even if she was, if we're going to hold trial judges some different standards, we'll have a list out. Finish your thought. Even if we want to say, gee, we would have liked more detailed findings, as long as the evidence is there, the fact that those findings aren't written out is excused. You led right into my question. We're a little handicapped here that we don't have even a transcript of a little explanation about whom Judge Stewart believed and didn't believe and why. All we have is the written order. That's exactly right. And the fact of the matter is, Your Honor, that I think that I certainly have seen situations where there were more detailed factual findings. But, again, the law is that if we have the evidence to show you, and we do, that that excuses what might otherwise be a request for more specific factual findings. Let me move you over to what we call the conflict of interest issue. Yes. Now, who was appointed as the guardian by Judge Stewart? David Kinn was appointed guardian of his estate. Of his estate only. And of his estate only. And at the time of that appointment, wasn't David suing him in Shand Street already? No, it was Leonard. Leonard was suing him. Leonard was, I think, had filed a lawsuit, again, in his own name, after that moment. He got adjudicated. Yes. And, Your Honor, I think that there certainly is a conflict there. And I think that I'm mindful of the Robertson case that they talk about, that says you are not in a conflict. And the most important thing is what follows. If it interferes with your ability to deal with the ward's estate. And the fact of the matter is, it's that part of it. The judge subsequently entered more than said, I'll let the Chancery case go ahead. I don't want David Kinn to have anything to do with it. And he hasn't. And that's how we've progressed. Well, how could he not have something to do with it if he's a defendant? He wasn't voluntarily dismissed as a defendant. He was not. Okay. And yet, Judge, what he can do is he doesn't have any say-so with respect to petitions for the approval of attorney's fees, the selection of counsel, or anything else. And by the way, there is, and I should tell in answer to the court's first question, what's going on in the guardianship proceeding, there is a notion in the guardianship proceeding to remove David. We're opposing that. But there's a notion to remove him based on this conflict and that he can't do it. And I think that's the appropriate court for that. What was the contour issue raised before Judge Stewart? It was certainly something that she was both aware of and dealt with. In the initial order, when she finds that Leonard a disabled person, she said, I'm reporting David. We'll deal with this conflict later. When she ultimately made the determination that the Chancery case could proceed, she entered in that order, David can't have anything to do with that. And so far it's worked well. But because the guardianship is an ongoing matter that facilitated Mr. Kainan, Leonard Kainan, being able to file the petition that's now pending, to remove him based on the continuing conflict in front of the new judge? Yes. Okay. And we'll have a decision on that, I think, in the near future, and we'll deal with that. But I think the important thing, and I appreciated the court's first question, what's going on? That's something we hear often in appellate advocacy because it's outside the record. But the important thing is there's nothing and no suggestion that David Kainan is doing anything inappropriate in terms of anything other than simply administering the assets. Leonard is on an allowance. It's working out. If the court doesn't have any other questions, I'd conclude my remarks. Thank you. Thank you. I direct the court's attention, with all due respect to Mr. Dahl, I direct the court's attention to the testimony of Mr. David Kainan and Chris Kainan in court, each of which were asked specifically who was managing the properties at issue. It's true that the Barrington House was in trust and they were the trustees of the trust. Leonard was the beneficiary of it. They testified that it was their father. Both of them testified it was their father that was managing both of those pieces of property. Throughout this entire period of time. Briefly with respect to the power of attorney issue. As the court knows that Judge Stewart left in place the power of attorney for health, meaning Nancy Kainan, his wife, indicated that that was totally appropriate. She did not, however, explain anything why she named the guardian of the estate without making any findings. Now they cite to this case of Doyle without making any findings that Nancy Kainan did anything wrong in her capacity as the guardian or her capacity as the agent under the power of attorney for property. There's no findings like there was findings in Doyle that laid out specifically what the proposed guardian did or didn't do, which was. We know Judge Stewart didn't give us a good roadmap. She didn't give us a good roadmap. So what's the remedy? The remedy with respect to the powers of attorney, the remedy with respect to the guardianship is to send it back. The remedy with respect to the powers of attorney is to give the hearing a minimum. But sometimes, you know, it's not unknown around here that we send a case back to a trial judge saying explain to us why you did this. But the problem is now Judge Stewart's retired. So all the new judge can do is look at the transcript and we can do the same thing. But the power of attorney for property is really key here, Judge, because it runs into the face of the probate act. She was supposed to have made findings with respect to whether or not Mr. Canning was able to revoke or control the agency. She made no such findings. The fact that she left the health care power of attorney in place seems to me to say she thought he could do that. But she's also supposed to make findings with respect to what did the agent do that was wrong that would not allow you to have the power of attorney for property go forward. This whole case was backwards. The power of attorney issue should have gone first, because if the power of attorneys were valid, there would be no need for guardianship. So if the power of attorney for property was voided inappropriately, there's no need for the guardianship. This court can send it back, at least at a minimum, for a hearing with respect to what was it that Nancy Canning allegedly did that could have been unlike in Doyle, where the court said the daughter's love turned to abuse, and she was raiding the mother's estate, bankrupting it. There were specific findings which the appellate court could say, yeah, I can see why she removed that person or would revoke the power of attorney for property. There was a world run relative to anything that Nancy Canning did wrong, and that's not right. Thank you. Thank you. Any other questions? All right. Thank you, counsel, for your arguments. The court will take the case under advisement, and court stands in recess.